**SECOND DIVISION**
**ANDREWS, P. J.,**
**MILLER and BRANCH, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**July 2, 2015**

# In the Court of Appeals of Georgia

A15A0205. PINKNEY v. THE STATE.

MILLER, Judge.

A jury convicted Jamaal Pinkney of two counts of attempted armed robbery (OCGA § 16-4-1), two counts of false imprisonment (OCGA § 16-5-41 (a)), and one count each of burglary (OCGA § 16-7-1 (b)), interfering with an emergency telephone call (OCGA § 16-10-24.3), and attempted burglary (OCGA § 16-4-1).[1] Pinkney appeals from the denial of his motion for new trial, contending that the trial court erred in (1) denying his motion for a mistrial after defense counsel misstated certain evidence during his opening statement, and (2) admitting into evidence

---

[1] The jury also found Pinkney guilty of two counts of aggravated assault (OCGA § 16-5-21 (b)) and the trial court merged those offenses with the attempted armed robbery convictions.

Pinkney's cell phone number and the records of his cell phone calls and text messages. For the reasons that follow, we affirm.

Viewed in the light most favorable to Pinkney's conviction,[2] the record shows that on the evening of December 31, 2011, an elderly woman and her live-in caregiver were watching television at the woman's home in Lithia Springs. Pinkney had occasionally performed odd jobs for the elderly woman and, earlier that month, Pinkney had stopped by the woman's house.

Just after 11:00 p.m. on December 31, the woman and her caregiver heard what sounded like an explosion, and Pinkney, armed with a square, silver gun, burst through the kitchen door, breaking the door and the doorframe. Pinkney was dressed all in black, with a hooded shirt pulled down over his face and a turtleneck pulled up to his mouth, so that only his eyes were uncovered. Although the women could not see Pinkney's face, the elderly woman asked Pinkney if she knew him from somewhere and recognized Pinkney by his voice and the way he moved. Once the elderly woman discovered that Pinkney was the intruder, she recognized his facial features as well.

---

[2] *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

After coming into the living room, Pinkney told the elderly woman and her caregiver to sit down, cursed at them, and pointed his gun at them. Pinkney forced the caregiver to sit down on the sofa by pointing his gun directly in her face. Pinkney asked the women where they kept their money and credit cards and dumped out the contents of the women's purses and bags onto the floor. The caregiver tried to dial 911 on her cell phone, but Pinkney took her phone and threw it across the room. At one point, Pinkney told the caregiver to pull up her nightgown and threatened to rape her.

The elderly woman then started holding her chest and saying that she could not breathe. She became pale and sweaty and started shaking, and the caregiver could not feel the woman's pulse. Pinkney then made a phone call, said that the victims did not have anything, and asked to be picked up. Pinkney kicked at the contents of the bags that he had dumped on the floor, unlocked the front door, and walked out of the house. Ultimately, nothing was taken from the house.

After Pinkney left, the caregiver called 911. A police officer responded just before midnight. Police officers observed that a window going into the basement of the woman's home had been broken, a lawn chair had been placed under the window and the door from the basement into the house had been forced open. Based on the

3

victims' statements that the intruder made a phone call, the police officers obtained a court order for records from all the major cell phone carriers showing all calls that went through the cell tower nearest to the woman's home at the time of the break in.

Police officers also spoke to the victims' neighbors to see if they had seen or heard anything suspicious and someone mentioned Pinkney. A police officer then searched for and found Pinkney's cell phone number through a paid online database. Police officers confirmed that phone calls made from Pinkney's cell phone had gone through the cell tower nearest to the victims' home.

Records showed that on December 29, Pinkney sent a text message to his girlfriend that he was going to "hit that jug," or go get some money, and he needed his girlfriend to find someone to watch their kids. On the early morning of December 30, Pinkney's girlfriend sent a text message to him asking, "Did [you] go in?" Pinkney responded that he had not gone in because he made too much noise breaking a window, but that he would go back the next night.

On the night of December 31, Pinkney sent a text message to his girlfriend just after 10:00 p.m. Eastern Standard Time stating that he was presently going through the window, and, shortly thereafter, at approximately 10:45 p.m., he sent a text message to her that he was in the house. Pinkney's girlfriend replied immediately by

4

asking Pinkney what was going on, and Pinkney responded, "[I'm] good, just let me handle this as fast as I can[, I'll text you when I'm done]." Pinkney then sent a text message to his girlfriend at approximately 11:30 p.m. and said that the victims did not have anything and he was upset.

When police later advised the elderly woman that Pinkney had been arrested, she said that she knew it was him who had broken into her home. At trial, the woman identified Pinkney as the man who broke into her house.

1. Pinkney contends that the trial court erred in denying his motion for a mistrial on the ground that during his opening statement, his trial counsel misstated evidence to the jury. Specifically, he argues that the State misled his trial counsel with regard to the timing of Pinkney's and his girlfriend's text messages, causing trial counsel to make an argument to the jury that was based on a misstatement of the evidence. We discern no error.

"Whether to declare a mistrial is in the discretion of the trial court and will not be disturbed on appeal unless it is apparent that a mistrial is essential to the preservation of the right to a fair trial." (Citations and punctuation omitted.) *Rafi v. State*, 289 Ga. 716, 720 (4) (715 SE2d 113) (2011).

During his opening argument, trial counsel had argued that the phone records were inaccurate and inconsistent with the other evidence, such as the 911 call, which showed that the perpetrator was inside the house about an hour later. On the evening of the first day of trial, the prosecutor alerted Pinkney's trial counsel that the records of Pinkney's text messages, which had previously been disclosed by the State, were in Central Standard Time, not in Eastern Standard Time, as trial counsel had originally assumed. Pinkney moved to prohibit the State from relying on the correct time of the calls or, in the alternative, for a mistrial. The trial court denied both motions.

At trial, an investigator with Pinkney's cell phone carrier testified regarding both Pinkney's and his girlfriend's cell phone records, including their text messages. The cell phone records confirmed that on December 31, 2011 between 10:00 p.m. and 11:30 p.m. Eastern Standard Time, calls made from Pinkney's cell phone had gone through the cell tower nearest the victims' home. The investigator also explained that Pinkney's carrier stored its customers' text messages in Texas and, accordingly, the text message records were kept in Central Standard Time. The records of the phone calls, however, were in Eastern Standard Time.

6

We cannot determine from the record what, exactly, defense counsel argued to the jury since the opening statements were not transcribed. Nonetheless, a mistrial was not essential to the preservation of Pinkney's right to a fair trial since the investigator's testimony corrected trial counsel's misstatement during opening argument, and the trial court instructed the jury that counsels' opening and closing arguments were not evidence. Cf. *Williams v. State*, 292 Ga. 844, 848-849 (3) (b) (742 SE2d 445) (2013) (trial counsel's misstatement to the jury regarding time of 911 call was not ineffective assistance because the misstatement was corrected by a detective's testimony and the trial court charged the jury that counsels' arguments were not evidence). Accordingly, the trial court did not err in denying Pinkney's request for a mistrial.

2. Pinkney contends that the trial court erred in admitting into evidence his cell phone number and the records obtained from his cell phone carrier because his phone number was obtained in violation of *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LEd2d 694) (1966). We disagree.

"The Fifth Amendment requires the exclusion of any statement made by an accused during custodial interrogation, unless he has been advised of his rights and has voluntarily waived those rights." (Citation omitted.) *Franks v. State*, 268 Ga. 238,

239 (486 SE2d 594) (1997). Georgia law, however, provides for a limited booking exception to the *Miranda* rule for questions attendant to arrest, such as the suspect's name, age, address, educational background and marital status. See id.

After Pinkney was arrested, a detective sought to interview him. Before reading Pinkney his *Miranda* rights, the detective stated that he had a few housekeeping issues. The detective asked Pinkney his full name, date of birth, age, and level of education. The detective then noted the date and time, asked Pinkney if he was under the influence of anything that could affect his decision making, whether he spoke and wrote English, and whether he spoke any other languages. The detective also asked Pinkney for a "contact number" and Pinkney responded with his cell phone number.

Immediately thereafter, the detective read Pinkney his *Miranda* rights. Pinkney indicated that he understood his *Miranda* rights and he invoked his right to counsel. The detective told Pinkney the charges against him, the interview ended, and Pinkney was taken back to jail. At trial, a video of Pinkney's conversation with the detective was played for the jury.

Whether a police officer may ask a suspect for his contact number under the booking exception to *Miranda* is not an issue that has been decided by this Court or the Supreme Court of Georgia. We need not decide this issue here because the police

8

officers obtained Pinkney's phone number from their own investigation before placing Pinkney under arrest. Since the police were able to obtain Pinkney's phone number and records independently of any alleged *Miranda* violation, this evidence was properly admitted. See *Teal v. State*, 282 Ga. 319, 323 (2) (647 SE2d 15) (2007) ("The independent source doctrine allows admission of evidence that was discovered by means wholly independent of any constitutional violation[.]") (citation omitted); see also *Merritt v. State*, 288 Ga. App. 89, 98 (2) (653 SE2d 368) (2007) (any error in admitting defendant's statement during booking that he drank alcohol on the day of the accident was harmless given other evidence that defendant had been drinking). Accordingly, we affirm.

*Judgment affirmed. Andrews, P. J., concurs. Branch, J., concurs in judgment only in Division 1 and fully in Division 2.*